# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LABADIE ENVIRONMENTAL ORGANIZATION, DINÉ CITIZENS AGAINST RUINING OUR ENVIRONMENT, HOOSIER ENVIRONMENTAL COUNCIL, WATERKEEPER ALLIANCE, INC., and SIERRA CLUB,<br><br>　　　　Plaintiffs,<br><br>　　　　v.<br><br>ANDREW WHEELER, ADMINISTRATOR, U.S. ENVIRONMENTAL PROTECTION AGENCY, in his official capacity,<br><br>and<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY,<br><br>　　　　Defendants. | Civil Action No. 1:20-cv-1819<br><br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

## INTRODUCTION

1.      Plaintiffs Labadie Environmental Organization, Diné Citizens Against Ruining our Environment, Waterkeeper Alliance, Inc., Hoosier Environmental Council, and Sierra Club (collectively "Plaintiffs") assert violations of the Resource Conservation and Recovery Act ("RCRA") by Defendants Andrew Wheeler, Administrator of the United States Environmental Protection Agency, and the United States Environmental Protection Agency (collectively "EPA" or "Defendants") for refusing to hold an in-person public hearing and ensure adequate public participation on EPA's proposed rollback to the 2015 Coal Ash Rule entitled: Hazardous and Solid Waste Management System: Disposal of Coal Combustion Residuals from Electric Utilities; A Holistic Approach to Closure Part A: Deadline to Initiate Closure, 84 Fed. Reg. 65,941 (Dec. 2, 2019) ("Part A Proposal").

2.      EPA refused Plaintiffs' repeated requests for an in-person hearing and a longer comment period on the Part A Proposal, thereby impairing Plaintiffs' and their members' ability to effectively communicate their grave concerns about the Part A Proposal which would allow millions of tons of additional toxic coal ash to be dumped into leaking, unlined, and/or dangerously-sited ponds.

3.      Coal ash generated by coal-fired power plants is one of the largest and most toxic solid waste streams in the United States. It contains contaminants that can cause cancer and other adverse health impacts including reproductive, neurological, respiratory, and developmental harm.

4.      For decades, in the absence of national standards requiring safe disposal, coal ash was dumped in thousands of unlined and unmonitored lagoons, landfills, pits, and mines. The

result was the widespread release of dangerous pollutants from coal ash to water, air, and soil, endangering human health and the environment.

5.      In 2015, after concluding that the "current management practice of placing [coal ash] waste in surface impoundments and landfills poses risks to human health and the environment," EPA promulgated the Coal Ash Rule pursuant to the Resource Conservation and Recovery Act, creating the first-ever national regulations specifying environmental and public health protections from coal ash disposal after a long history of regulatory delay. *See* Hazardous and Solid Waste Management System; Disposal of Coal Combustion Residuals from Electric Utilities, 80 Fed. Reg. 21,302, 21,451 (Apr. 17, 2015) ("2015 Rule" or "2015 Coal Ash Rule").

6.      Just a few years after the 2015 Rule was promulgated, at industry's urging and contrary to a 2018 D.C. Circuit decision requiring more stringent regulation, EPA commenced a vigorous effort to weaken the 2015 Rule.

7.      Within the eight-month period from July 2019 to March 2020, EPA proposed five significant new rulemakings that would weaken the environmental and public health protections in the 2015 Coal Ash Rule, as well as a related proposal that would roll back Clean Water Act treatment standards for coal ash discharges.

8.      The Part A Proposal is EPA's third set of amendments seeking to weaken the critical protections set forth in the 2015 Coal Ash Rule. The Part A Proposal would have adverse impacts on the environment and the health of individuals throughout the United States by allowing utilities to delay closing and therefore to dump millions of tons of additional toxic coal ash into leaking, unlined, and/or dangerously-sited ponds.

9. Plaintiffs' members derive recreational, scientific, aesthetic, commercial, life-sustaining, and spiritual benefits from groundwater, rivers, waterways, and other areas affected by EPA's Part A Proposal.

10. Despite the grave threats posed by the Part A Proposal to Plaintiffs and their members, and other communities impacted by coal ash pollution, EPA refused to hold an in-person hearing and only offered the public a "virtual," audio-only public hearing on the Part A Proposal. EPA's refusal to have an in-person public hearing on the Part A Proposal marks a clear reversal of its longstanding position that RCRA requires EPA to hold in-person public hearings on proposed coal ash regulations and amendments thereto.

11. While virtual public hearings can be an important supplement to in-person public hearings, they alone do not satisfy EPA's nondiscretionary duty under RCRA to hold a public hearing on regulatory changes and to provide for, assist, and encourage adequate public participation.

12. EPA further curtailed opportunities for public comment on the Part A Proposal by offering an insufficient comment period that ran over the winter holidays and coincided with the comment period for a separate but related coal ash regulatory rollback proposal.

13. Plaintiffs seek a declaratory judgment that EPA's refusal to hold an in-person public hearing and to provide sufficient participation opportunities on the Part A Proposal violated RCRA. Plaintiffs also seek injunctive relief compelling EPA to hold an in-person public hearing when it is safe to do so and to re-open the comment period on the Part A Proposal.

## JURISDICTION AND VENUE

14. This action arises under the citizen suit provision of the Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a)(2).

15.     This Court has jurisdiction over this action pursuant to 42 U.S.C. § 6972(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1361.

16.     Plaintiffs have standing to bring this action on behalf of their members.

17.     This Court may award Plaintiffs all necessary relief pursuant to 42 U.S.C. § 6972(a) and 28 U.S.C. §§ 2201-02.

18.     Venue is proper because the RCRA citizen suit provision expressly provides that any action under 42 U.S.C. § 6972(a)(2) may be brought in the District Court for the District of Columbia.

19.     By registered letter posted on February 7, 2020, and received on February 10, 2020, Plaintiffs gave notice of their intent to sue Defendants for their failure to perform mandatory duties under RCRA and have thereby complied with the sixty-day notice requirement of the RCRA citizen suit provision. *See* 42 U.S.C. § 6972(c); Notice Letter (attached as Ex. 1).

## PARTIES

20.     Plaintiff LABADIE ENVIRONMENTAL ORGANIZATION (LEO) is a grassroots, non-profit, non-partisan citizens group in Franklin County, Missouri focused on addressing public concerns related to coal ash and coal-fired power plant pollution. It was established in 2009, when electricity utility company Ameren Missouri proposed to build a coal ash landfill in the floodplain of the Missouri River at its Labadie power plant. LEO's mission is to inform and educate the community about environmental issues impacting their health and well-being, to inspire positive change, and to encourage practices for sustainability.

21.     LEO members live, work and recreate near Ameren's coal ash ponds. LEO members are concerned about the unlined coal ash ponds at the Labadie plant which are leaking

4

and contaminating groundwater and the threat such contamination presents to the groundwater that they drink and rely on for other domestic purposes.

22.     Plaintiff DINÉ CITIZENS AGAINST RUINING OUR ENVIRONMENT (Diné C.A.R.E.) is an all-Navajo organization comprised of grassroots community members active on Navajo Nation lands in and around the Four Corners region of Arizona, New Mexico, Colorado, and Utah. Diné C.A.R.E. advocates for traditional teachings by protecting and providing a voice for all life within and beyond the Four Sacred Mountains. Diné C.A.R.E promotes regenerative and sustainable uses of natural resources consistent with the Diné philosophy of life. It empowers local and traditional people to organize and determine their own destinies, in ways that protect the health of their communities, their long held subsistence practices and way of life.

23.     Diné C.A.R.E. members are deeply concerned about coal ash pollution from leaking, unlined coal ash ponds at the Four Corners Generating Station on Navajo Nation lands and the impact this toxic pollution has on nearby groundwater, major rivers, waterways and nearby Navajo communities as well as culturally significant sites. This pollution detrimentally threatens Diné C.A.R.E. members' food security. It adversely impacts their cultural and spiritual practices connected to Chaco Wash and the San Juan River and hinders their ability to enjoy and recreate on the San Juan and Animas Rivers.

24.     Plaintiff HOOSIER ENVIRONMENTAL COUNCIL, INC. (HEC) is an Indiana non-profit organization dedicated to shaping Indiana's environmental future. It is one of the state's largest environmental advocacy organizations and uses education and advocacy to secure a healthier environment for all Hoosiers and protection of Indiana's forests, lakes, rivers, native fish and wildlife, and groundwater.

25.     HEC members live and work near unlined coal ash ponds in Indiana where there is evidence of contamination of groundwater on which they rely. The coal ash ponds are also located within floodplains and next to major rivers, which HEC members recreate on or near, and which are also threatened with coal ash contamination.

26.     Plaintiff WATERKEEPER ALLIANCE, INC. is a non-profit organization headquartered in New York, New York, uniting more than 350 Waterkeeper member and affiliate organizations that are on the frontlines of the global water crisis and patrolling and protecting more than 2.5 million square miles of waterways on six continents. From the Great Lakes to the Himalayas, Alaska to Australia, the Waterkeeper movement defends the fundamental human right to drinkable, fishable, and swimmable waters, and combines firsthand knowledge of local waterways with an unwavering commitment to the rights of communities. Within the United States, Waterkeeper Alliance, Inc. works with more than 175 Waterkeeper member organizations and affiliates.

27.     Members of Waterkeeper Alliance work and recreate in waterways that are threatened by coal ash pollution from unlined coal ash ponds nationwide. They are concerned about their health and well-being as they work to protect these waterways from new threats and clean up existing pollution. As a result of this concern, they limit their recreational activity on the waterways to avoid prolonged contact with water contaminated by coal ash pollution.

28.     Plaintiff SIERRA CLUB is America's largest grassroots environmental organization, with more than 3 million members and supporters nationwide. Sierra Club's mission is to explore, enjoy, and protect the wild places of the earth, practice and promote the responsible use of the Earth's resources and ecosystems, educate and enlist humanity to protect and restore the quality of the natural and human environment, and use all lawful means to carry

6

out those objectives. Its activities include public education, advocacy, and litigation to enforce environmental laws.

29.     Sierra Club members recreate near and on rivers which are threatened by coal ash contamination from nearby unlined, leaking coal ash ponds. They are deeply concerned about the impacts this toxic pollution has on the rivers, their riparian habitat, and aquatic life. This concern diminishes their ability to enjoy and recreate on or near the rivers they so value.

30.     Plaintiffs' members use and enjoyment of their property, groundwater, and local waterways have been, and/or are threatened to be, diminished due to coal ash pollution that will be exacerbated by the Part A Proposal. These members have an interest in protecting their own health, the health of their children and families, and the health of their communities.

31.     Defendants' refusal to provide an in-person public hearing and adequate public participation opportunities on the Part A Proposal, as required by RCRA, denied Plaintiffs' members the opportunity to effectively communicate to EPA their concerns about increased exposure to contamination associated with coal ash waste.

32.     Although Plaintiffs' members participated in the January 7 virtual public hearing, they found it to be an inadequate substitute for an in-person hearing and were denied the opportunity to speak directly to and engage in dialogue with EPA representatives, to use visual aids, and to draw support from others physically present in the same room. As a result of the meeting format, they were unable to effectively communicate their concerns about the Part A Proposal.

33.     Particularly when combined with EPA's refusal to extend the sixty-day comment period on the Part A Proposal that overlapped with the winter holidays, EPA's refusal to hold an

in-person hearing deprived Plaintiffs' members of the opportunity to adequately provide comment on the Part A Proposal.

34.     EPA's refusal to provide an in-person hearing and extend the comment period on the Part A Proposal (a) deprives Plaintiffs' members of opportunities to effectively communicate their concerns to EPA and provide input about the Part A Proposal; (b) increases the risk to Plaintiffs' members of exposure to contaminants in coal ash waste; and (c) in some cases, increases and prolongs Plaintiffs' members' ongoing exposure to such contaminants and their associated risk of adverse health effects accordingly.

35.     Plaintiffs' members would like to, and if given the opportunity when public health conditions related to COVID-19 allow for safe travel and public congregation, would testify in-person to express their concerns about the Part A Proposal.

36.     Plaintiffs' members have been and, unless the relief prayed for herein is granted, will continue to be adversely affected by EPA's failure to comply with RCRA.

37.     Defendant Andrew Wheeler is the Administrator of the United States Environmental Protection Agency. He is being sued in his official capacity only.

38.     Defendant United States Environmental Protection Agency is an agency of the federal government. EPA's mission is "to protect human health and the environment."

## LEGAL FRAMEWORK

### I.     The Resource Conservation and Recovery Act and the 2015 Rule

39.     RCRA is the principal federal statute governing the handling, storage, treatment, transportation, and disposal of solid and hazardous waste. In enacting RCRA, Congress recognized that "disposal of solid waste and hazardous waste in or on the land without careful planning and management can present a danger to human health and the environment." 42 U.S.C. § 6901(b)(2). RCRA also articulates Congress's recognition that "inadequate and

environmentally unsound practices" for the disposal of solid waste create greater amounts of air and water pollution and other problems for the environment and health. 42 U.S.C. § 6901(b)(3).

40.     The goal of RCRA is to protect health and the environment by, among other things, requiring open dumps to convert to facilities which do not pose a danger to the environment or health. *See id.* § 6902(a)(3).

41.     In 2015, pursuant to a court order, EPA established the first-ever federal regulations governing coal ash disposal under RCRA. *See Appalachian Voices v. McCarthy*, 989 F. Supp. 2d 30, 54-56 (D.D.C. 2013) (directing EPA to comply with statutory duty to promulgate coal ash disposal regulations); 42 U.S.C. §§ 6907(a), 6944(a); 80 Fed. Reg. 21,302. The 2015 Rule established national minimum criteria for coal ash ponds and landfills including location restrictions, design and operating criteria, groundwater monitoring, corrective action, post-closure care, recordkeeping, notification, and public disclosure requirements. *Id.*

42.     Because in 2015, RCRA neither authorized EPA to directly implement minimum national criteria for solid waste disposal facilities nor to enforce such criteria, EPA established the 2015 Coal Ash Rule as a "self-implementing rule" enforced by members of the public via citizen suits. *Id.* at 21,331.

43.     RCRA authorizes citizen suits "against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator." 42 U.S.C. § 6972(a)(2).

44.     RCRA imposes a clear-cut, nondiscretionary duty on Defendants to hold public hearings when it promulgates coal ash regulations. 42 U.S.C. §§ 6907(a) and 6944(a). EPA has cited both of these statutory provisions as its legal authority for the Part A Proposal.

45.     RCRA also imposes a clear-cut, nondiscretionary duty on Defendants to ensure that the public has meaningful opportunities to provide input into regulations governing the disposal of coal ash waste. RCRA provides that "[p]ublic participation in the development, revision, implementation, and enforcement of any regulation, guideline, information, or program under this chapter *shall* be provided for, encouraged, and assisted by the Administrator." *Id.* § 6974(b) (emphasis added). Prior to departing from this practice for the Part A Proposal, EPA had routinely held in-person public hearings in implementing these nondiscretionary duties, as supported by EPA regulations and guidance going back to 1979.

46.     EPA's public participation regulations commit the Agency to "provide for, encourage, and assist the participation of the public," "foster a spirit of openness and mutual trust among EPA . . . and the public," and "use all feasible means to create opportunities for public participation, and to stimulate and support participation." 40 C.F.R. § 25.3(a), (c).

## FACTUAL BACKGROUND

### I.     The Toxic Threats Posed by Coal Ash

47.     Coal ash is one of the largest industrial wastestreams in the United States. Coal-fired power plants in the United States produce more than 100 million tons of coal ash each year. Coal ash contains "myriad carcinogens and neurotoxins" and utilities dispose of it in "massive" disposal sites including hundreds of landfills and ash ponds throughout the country, which are "generally . . . at varying degrees of risk of protracted leakage and catastrophic structural failure." *See Util. Solid Waste Activities Grp. v. Envtl. Prot. Agenc*y, 901 F.3d 414, 420-21 (D.C. Cir. 2018).

48.     When coal ash is not disposed of in properly sited, constructed, and operated facilities, toxic contaminants can be released to air, groundwater, surface water, and soil.

49.     There are hundreds of leaking, unlined, and improperly sited coal ash ponds in the U.S. polluting groundwater as well as bays, lakes, rivers, and streams. These coal ash ponds release toxic and radioactive substances into the water, including large quantities of heavy metals and metal compounds such as arsenic, boron, cadmium, hexavalent chromium, lead, lithium, mercury, molybdenum, selenium, and thallium.

50.     The toxic contaminants in coal ash can cause cancer and other adverse health impacts including reproductive, neurological, respiratory, and developmental harm.

51.     Arsenic is a known human carcinogen that causes cancer of the skin, liver, bladder, and lungs. 80 Fed. Reg. at 21,451. Boron "can pose developmental risk to humans when released to groundwater and can result in stunted growth, phytotoxicity, or death to aquatic biota and plants when released to surfacewater bodies." Hazardous and Solid Waste Management System: Disposal of Coal Combustion Residuals From Electric Utilities; Amendments to the National Minimum Criteria (Phase One); Proposed Rule, 83 Fed. Reg. 11,584, 11,589 (Mar. 15, 2018). Lead is a very potent neurotoxin that can cause "kidney disease, lung disease, fragile bone[s], decreased nervous system function, high blood pressure, and anemia." Hazardous and Solid Waste Management System; Identification and Listing of Special Wastes; Disposal of Coal Combustion Residuals From Electric Utilities; Proposed Rule, 75 Fed. Reg. 35,128, 35,169 (June 21, 2010). Exposure to mercury, another neurotoxin, can "permanently damage the brain, kidneys, and developing fetus." *Id.* Molybdenum exposure can result in "higher levels of uric acid in the blood, gout-like symptoms, and anemia." 80 Fed. Reg. at 21,451.

52.     In 2015, EPA promulgated regulations to begin to address the longstanding threats posed by coal ash. *See* 80 Fed. Reg. 21,302. The 2015 Coal Ash Rule provides safeguards for coal ash disposal and protections for communities threatened by coal ash contamination.

53.     On September 13, 2017, EPA announced that it would initiate rulemaking to reconsider provisions of the 2015 Rule as requested in petitions submitted by the Utility Solid Waste Activities Group and AES-Puerto Rico. Since promulgating the 2015 Coal Ash Rule, EPA has proposed five different revisions to the Rule that significantly blunt important protections.

54.     One of those proposals is the Part A Proposal, which was published in the *Federal Register* on December 2, 2019. *See* Part A Proposal, 84 Fed. Reg. 65,941.

55.     The Part A Proposal would enable utilities to delay closing ash ponds for a significantly longer period of time than the deadline provided in the 2015 Rule, notwithstanding the D.C. Circuit's 2018 ruling that the existing provisions of the rule are insufficiently protective.

56.     The Part A Proposal would therefore allow millions of tons of additional toxic coal ash waste to be dumped into leaking, unlined, and/or dangerously-sited ponds and would prolong the risk to neighboring communities of groundwater contamination, catastrophic spills, or other harms from those ponds.

57.     Nationwide, risk of harm from coal ash pollution is borne disproportionately by communities of color and low-income communities.

58.     Members of the Plaintiff organizations are adversely affected by the closure delays and increased risks of harm due to EPA's Part A Proposal.

59.     Plaintiffs' members were also harmed by Defendants' decision not to hold an in-person public hearing and to curtail opportunities for public comment because it undermined their ability to express their concerns about the Part A Proposal.

**II.     Public Hearing and Participation on the Part A Proposal**

60.     Upon publishing the Part A Proposal on December 2, 2019, EPA announced a sixty-day comment period on the proposed rule. This comment period ran through the winter holiday season, including Christmas, Hanukkah, Kwanzaa, New Year's Day, and Martin Luther

King, Jr. Day, which substantially shortened the available working days for Plaintiffs and the public in general. Part A Proposal, 84 Fed. Reg. 65,941 (Dec. 2, 2019).

61.     In addition, the comment period for the Part A Proposal almost entirely overlapped with the comment period for a related EPA proposal which would roll back Clean Water Act treatment requirements for coal ash wastewater dischargers, which was also of great concern to and would adversely impact Plaintiff organizations and their members. Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category. 84 Fed. Reg. 64,620 (Nov. 22, 2019).

62.     Plaintiffs were therefore required to comment on two concurrently-pending, highly-technical regulatory proposals during an abbreviated comment period. This served to inhibit rather than encourage public participation and undermined Plaintiffs' and their members' ability to adequately comment on the Part A Proposal.

63.     EPA's December 2, 2019 proposal stated that it would hold one public hearing on the Part A Proposal, to be held on January 7, 2020 with a registration deadline of January 3, 2020. EPA did not specify whether the hearing would be held virtually or in person. *Id.*

64.     EPA later indicated that the public hearing on the Part A Proposal would be virtual. Speakers were required to first register online and then to call in to a webinar to provide oral testimony.

65.     EPA announced its decision to have a virtual rather than an in-person hearing, and provided registration instructions, only electronically and did not publish notice of the virtual hearing decision in the Federal Register or in any other official print publications. *Virtual Public Hearing on the Proposal: A Holistic Approach to Closure Part A,*

https://www.epa.gov/coalash/forms/virtual-public-hearing-proposal-holistic-approach-closure-part.

66.     EPA's decision to hold only a virtual hearing on the Part A Proposal, and its refusal to hold an in-person public hearing, was a clear reversal of its longstanding position that RCRA requires EPA to hold in-person public hearings on proposed regulatory changes. Indeed, prior to the Part A rulemaking EPA had held at least one, if not multiple, in-person hearings for every proposed coal ash regulation and amendments thereto.

67.     As evidenced by EPA's 2016 RCRA Public Participation Manual, 1979 Part 25 Public Participation Regulation, and 2003 Public Involvement Policy, EPA's longstanding interpretation of a public hearing is that it is an in-person event and that virtual public hearings should supplement, but not replace, in-person hearings, which are the bedrock of public participation in the rulemaking process.

68.     Former long-time EPA staff who were directly involved in promulgating the Agency's public participation regulations and in other public participation efforts submitted comments to EPA on the Part A Proposal urging it to hold an in-person public hearing. These former EPA staff stated that hearing directly, in-person, from affected citizens is a crucial part of the decision-making process and that the "Part 25 Public Participation regulation expected hearings to be in-person hearings and that was the common understanding at EPA." *See* Comment of Lee Daneker, Docket ID. No. EPA-HQ-OLEM-2019-0172-0027 (Jan. 7, 2020); Comment of Environmental Protection Network, Docket ID. No. EPA-HQ-OLEM-2019-0172 (Jan. 31, 2020). As one former EPA staff member explained, in-person hearings promote dialogue and encourage questioning that elicits useful information, which is much harder to do

when contact is a "disembodied voice." *See* Comment of Steven Silverman, Docket ID. No. EPA-HQ-OLEM-2019-0172-0026 (Jan. 2, 2020).

69.     Despite being contrary to EPA's own regulations and guidance, EPA has now offered only virtual hearings, and refused requests for in-person public hearings, for three major proposals regarding coal ash disposal. This dramatic change in position, which began with EPA's refusal to have an in-person hearing on the Part A Proposal, does not reflect EPA's authoritative, expert-based, or fair and considered judgment, and violates RCRA.

70.     On December 4, 2019, eighty-seven public interest organizations, including Plaintiffs, requested that EPA hold an in-person public hearing on the Part A Proposal in addition to the virtual public hearing, and extend the comment period to 120 days to ensure that the public has a meaningful opportunity to express its concerns about the Part A proposal to EPA.

71.     EPA refused these requests in a letter dated December 16, stating that it would neither hold an in-person public hearing nor extend the comment period.

72.     EPA held a virtual hearing on the Part A Proposal on January 7, 2020.

73.     Participation at the hearing was sparse. No one commented at all during nearly half of the eight hour hearing.

74.     Participants had to call in at a designated time to deliver their testimony. Because they could only call in and not participate by video, participants could not share any visual aids to supplement their verbal testimony. Nor could they see who, if anyone, was listening and could therefore not gauge how their testimony was being received.

75.     Participants did not have the opportunity to make eye contact or otherwise connect on a human-to-human basis with the regulators. Nor did participants, including those who provided testimony and those who listened, have an opportunity to connect with other

members of the public who may share their concerns. Participants lost the ability to organize and draw support from others physically present in the same room.

76.     At times, the testimony itself was muffled and was disrupted by technological or telephonic problems. In some cases, EPA simply cut off the testimony of a participant when such problems arose and asked the participant to submit written copies of their remarks instead.

77.      EPA also abruptly muted several participants as they were delivering their testimony because EPA's predetermined five-minute time limit had expired, notwithstanding the fact that there were multiple open periods with no scheduled testimony.

78.     The hearing format discouraged dialogue between EPA and participants. EPA panelists did not ask any participants clarifying questions and there was no opportunity for informal conversation.

79.     Over seventy-five percent of participants at the hearing used part of their limited speaking time to highlight their dismay over the virtual format of the hearing, citing it as a deterrent to public participation and expressing that they felt constrained by the format.

80.     Many participants stressed that they did not feel heard or seen by EPA through the virtual format, and some questioned whether anyone was listening to them at all while testifying. These commenters uniformly called upon EPA to hold an in-person hearing on the Part A Proposal.

81.     Several participants from communities impacted by coal ash pollution in rural West Virginia, Virginia, Missouri, and the Ohio River Valley explained that many of their community members had limited access to the internet, thereby impairing their ability to participate or deterring them from participating in the January 7 hearing.

82.     Participants also noted that the technology required to received notice of and participate in the hearing specifically discouraged elderly community members from participating. A member of Plaintiff Waterkeeper Alliance read aloud the testimony of another member, a seventy-year-old man who was too intimidated by the required technology to participate directly but would have driven hundreds of miles to participate at an in-person hearing. A ninety-two-year-old member of Plaintiff Labadie Environmental Organization needed help from others in order to participate because she did not have access to the appropriate technology.

83.     The technology required to receive notice of and participate in the January 7 hearing served as a barrier for environmental justice communities, including members of Plaintiff organizations, who disproportionately lack internet access and are disproportionately affected by contaminated coal ash ponds.

84.     The January 7, 2020 virtual hearing on the Part A Proposal was not an adequate substitute for an in-person public hearing and was held before the United States reported its first confirmed case of COVID-19.

85.     Defendants made it clear that EPA would not offer an in-person hearing or a longer comment period on the Part A Proposal because it determined that they were "not in the public interest." The comment period on the Part A Proposal ended on January 31, 2020.

86.     Defendants' refusal to hold an in-person hearing and to extend the comment period on the Part A Proposal deprived members of the Plaintiff organizations of the opportunity to meaningfully express their concerns to EPA decision-makers about the Part A Proposal. This in turn undermined EPA's ability to identify the full range of environmental and health impacts and develop an adequate record necessary for reasoned and well-informed rulemaking.

87.     EPA's inability to identify and document the full range of impacts from the Part A Proposal increases the risk to Plaintiffs' members of exposure to coal ash contaminants and associated adverse health effects.

<u>CLAIMS FOR RELIEF</u>

**COUNT I**
**Defendants Unlawfully Failed to Hold an In-Person Public Hearing on the Part A Proposal**

88.     Plaintiffs re-allege and incorporate the allegations of all the preceding paragraphs of this Complaint, as well as all exhibits, as if fully set forth herein.

89.     RCRA requires Defendants to hold in-person public hearings prior to developing and publishing coal ash regulations. *See* 42 U.S.C. §§ 6907(a) and 6944(a).

90.     Defendants' aforementioned duties under 42 U.S.C. §§ 6907(a) and 6944(a) are nondiscretionary.

91.     The January 7, 2020 virtual hearing did not satisfy Defendants' nondiscretionary duty to hold a public hearing as required by RCRA.

92.     Defendants have breached their mandatory, nondiscretionary duty to hold an in-person public hearing on the Part A Proposal.

93.     Unless Defendants perform their nondiscretionary duty to have an in-person public hearing, Plaintiffs and their members will suffer irreparable harm.

94.     There exists an actual controversy regarding whether or not Defendants' actions and inactions described are lawful pursuant to RCRA. Plaintiffs are interested parties because they were subject to those described actions and inactions.

95.     Plaintiffs have no adequate remedy at law, and therefore equitable relief is warranted.

## COUNT II
## Defendants Unlawfully Failed to Ensure Adequate Public Participation on the Part A Proposal

96.     Plaintiffs re-allege and incorporate the allegations of all the preceding paragraphs of this Complaint, as well as all exhibits, as if fully set forth herein.

97.     EPA's refusal to hold an in-person hearing on the Part A Proposal, together with the inadequate comment period, did not provide Plaintiffs with an adequate opportunity to participate in the Part A rulemaking.

98.     RCRA requires that "[p]ublic participation in the development, revision, implementation, and enforcement of any regulation, guideline, information, or program under this chapter shall be provided for, encouraged, and assisted by the Administrator and the States." 42 U.S.C. § 6974(b)(1).

99.     Defendants' duty under 42 U.S.C. § 6974(b) is nondiscretionary.

100.     Defendants failed to "provide[] for, encourage[], and assist[]" public participation on the Part A Proposal-as required by 42 U.S.C. § 6972(a)(2) and. § 6974(b). Defendants therefore breached their mandatory, nondiscretionary duty.

101.     Unless Defendants perform their nondiscretionary duty to hold an in-person hearing and provide an adequate public comment period regarding the Part A Proposal, Plaintiffs and their members will suffer irreparable harm.

102.     There exists an actual controversy regarding whether or not Defendants' actions and inactions described are lawful pursuant to RCRA. Plaintiffs are interested parties because they were subject to those described actions and inactions.

103.     Plaintiffs have no adequate remedy at law, and therefore equitable relief is warranted.

## <u>PRAYER FOR RELIEF</u>

Plaintiffs respectfully request this Court grant the following relief:

a.      Declare that Defendants violated the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6907(a) and 6944(a), by refusing to hold an in-person public hearing on the Part A Proposal;

b.      Declare that Defendants violated the Resource Conservation and Recovery Act, 42 U.S.C. § 6974(a), by refusing to hold an in-person public hearing and failing to provide an adequate comment period on the Part A Proposal;

c.      Order Defendants to hold an in-person public hearing on the Part A Proposal before finalizing it, as required by the Resource Conservation and Recovery Act;

d.      Order Defendants to offer an adequate comment period on the Part A Proposal, as required by the Resource Conservation and Recovery Act;

e.      Award Plaintiffs their litigation costs and reasonable attorneys' fees in this action; and,

f.      Provide any other necessary and appropriate relief.


DATED: July 6, 2020


Respectfully,

/s/ Jennifer Cassel_____

Jennifer Cassel
Shubra Ohri (to be admitted *pro hac vice*)
Thomas J. Cmar (to be admitted *pro hac vice*)
Lisa Evans (to be admitted *pro hac vice*)
Earthjustice
311 S. Wacker Drive, Suite 1400

Chicago, IL 60606
Phone:  (312) 500-2196

*Counsel for Plaintiffs*